# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CP-00225-COA

**WILLIE J. PERKINS, SR.** APPELLANT

v.

**JAMES K. LITTLETON** APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/23/2017 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WILLIE J. PERKINS SR. (PRO SE) |
| ATTORNEY FOR APPELLEE: | JAMES K. LITTLETON (PRO SE) |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 08/21/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., WILSON AND GREENLEE, JJ.

### WILSON, J., FOR THE COURT:

¶1.     During a lengthy radio advertisement in support of his campaign for circuit court judge, James K. Littleton stated that "the father of one of [his] opponents" had "conspired" with Littleton's family "to go public with [a] family dispute to derail [Littleton's] campaign." Littleton had only two opponents in the election. One opponent's father was deceased. The other opponent's father was Willie K. Perkins Sr. Perkins perceived that Littleton's statement was directed at him, he informed Littleton that the statement was false and demanded a retraction, and he subsequently sued Littleton for defamation.

¶2.     The Leflore County Circuit Court granted summary judgment for Littleton on the ground that his statement was "not clearly and unmistakably directed toward [Perkins]." We

affirm the circuit court's ruling but for different reasons. Littleton's statement was clearly directed at Perkins because it could not have been directed at anyone but Perkins. In addition, there are factual disputes as to whether the statement was false and whether Littleton knew it was false. Nonetheless, we affirm the circuit court's ruling because, as a matter of law, Littleton's statement was not defamatory.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. Perkins and Littleton are both practicing attorneys in Greenwood. Perkins is also a state legislator. Littleton is also a justice court judge.

¶4. In 2014, Littleton was one of three candidates for circuit court judge in the Fourth Circuit Court District, Place 3. The other two candidates were Perkins's daughter (Takiyah Perkins) and Carol White-Richard.

¶5. In August and September 2014 the *Greenwood Commonwealth* published articles about a lawsuit that Littleton's mother and sister had filed against Littleton in the Bolivar County Chancery Court. In the lawsuit, Littleton's mother and sister alleged that Littleton had forged deeds related to his deceased father's estate. As the newspaper articles reported, Littleton denied the lawsuit's allegations.

¶6. In September 2014, Littleton ran a lengthy advertisement on two local radio stations. In the ad, Littleton stated in part as follows:

> This is James Littleton, candidate for Circuit Court Judge of the Fourth District, Place 3. In addressing the story first reported by the *Greenwood Commonwealth*, I'm not surprised that they would report a misleading and half-truth story as they did.
>
> Now, let's get to the whole truth. First, it was reported that I cursed my

2

mother out. The *Commonwealth* has been armed with this story for two weeks, and the reporter writing this story has interviewed me, recorded me, but has never asked me to respond to this false allegation. I am a child of God and I am obedient to my parents.

Second, they failed to report that I have known about a conspiracy and meeting between my family and the father of one of my opponents for several months where they conspired to go public with this family dispute to derail my campaign. Prior to being contacted by the Commonwealth, my sister sent derogatory and false comments to one of my campaign workers via facebook and stated she supported Takiyah Perkins for Circuit Court Judge.

. . . .

I'm aware of the allegations made by my mother who birthed me into this world and my sister that I forged their signatures on various documents in the handling of my deceased father's estate several years ago. I love my mother and my sister but I am disappointed in them. These allegations were made by them approximately one year ago well in advance of my decision to run for circuit judge. I want the voters . . . to know that these allegations are not true, and that I have not forged the signatures of my mother or sister on any document relating to my father's estate.[1]

¶7. The following day, Perkins sent Littleton a cease-and-desist letter and demand for retraction. Perkins identified the following statement from the ad as false and defamatory: "I have known about a conspiracy and meeting between my family and the father of one of my opponents for several months where they conspired to go public with this family dispute to derail my campaign." Perkins asserted that the statement clearly was directed toward him because Littleton knew that White-Richard's father was deceased. Perkins asserted that the statement was false because he had never met or spoken to Littleton's mother or sister.

¶8. According to Littleton, the ad already was scheduled to stop running on or about the

---

[1] We quote the transcript of the ad that is in the record with only minor alterations to its punctuation.

3

day he received Perkins's letter. Littleton did not retract his statement because he says he believed it to be true. Littleton claims that his mother told him "that she had met with the father of one of his opponents" in an effort to derail his campaign. Littleton also says that his mother did not tell him whose father she met with, and he did not know. Littleton denies that he knew at the time that White-Richard's father was deceased, and he denies that his statement was directed at Perkins.

¶9. In September 2015, Perkins sued Littleton for libel, slander, and defamation. Littleton answered and subsequently filed a motion to dismiss or for summary judgment. Littleton argued that Perkins could not prove defamation because the statement in the radio ad was not clearly directed at Perkins. Littleton also argued that the alleged defamation was not clear and unmistakable on its face and that Perkins's claim was based on innuendo, speculation, and conjecture. Littleton's motion references several attached exhibits, including Littleton's affidavit, but those exhibits do not appear to have been filed in the circuit court.

¶10. In response, Perkins argued that Littleton's comments clearly were directed toward him because Littleton knew that White-Richard's father was deceased. In an affidavit, Perkins stated that Littleton was present when White-Richard stated that her father was deceased during a speech at a July 2014 meeting of the Greenwood Voters League. Perkins also submitted White-Richard's father's obituary, which shows that he passed away on November 17, 2013, ten months before Littleton ran his ad. Perkins also submitted affidavits from three other Leflore county residents who heard Littleton's ad. All three knew that Littleton's comment was directed at Perkins because they knew that White-Richard's father

4

was deceased.

¶11.   Perkins also argued that Littleton knew that his statement was false.  In support, Perkins submitted affidavits from Littleton's mother, Bonnie Littleton, and sister, Melaney Littleton Phillips.  Both women stated that they had never met or talked to Perkins or conspired with Perkins to derail Littleton's campaign.  In addition, Bonnie Littleton specifically denied that she had ever told Littleton that she "met with the father of one of his opponents."  Bonnie Littleton's affidavit states: "This sworn statement by my son is a complete falsehood.  I never made any such statement to my son."

¶12.   In rebuttal, Littleton submitted an affidavit from Emma Bell stating that she heard Littleton's mother tell him that she had met with the father of one of Littleton's opponents. Bell further stated that she did not know that White-Richard's father was deceased and, thus, did not know whom Littleton's mother was talking about.  Bell's affidavit also asserts that Bonnie Littleton is a known "liar."

¶13.   Following a hearing, the circuit court found that the allegedly defamatory statement was "not clearly and unmistakably directed toward [Perkins]."  The court reasoned that the particular statement did "not specifically name [Perkins] or his daughter," and "although some listeners may have believed the statement was about [Perkins], the statement by itself was insufficient to establish a claim of slander."  Accordingly, the court granted Littleton's motion for summary judgment.  Perkins thereafter filed a timely notice of appeal.

## ANALYSIS

¶14.   On appeal, Perkins argues that the circuit court erred by granting Littleton's motion

5

for summary judgment. Perkins specifically argues that the circuit court erred by treating his claim as a claim for "slander" rather than "libel"[2] and by ruling that a "defamatory statement must refer to [the plaintiff] by name." Perkins also argues that Littleton effectively "accused [him] of a criminal conspiracy." Finally, Perkins argues that the circuit court erred by denying as moot his motion for leave to conduct additional discovery and his motion to compel the *Greenwood Commonwealth* to respond to a subpoena.[3] Littleton responds to Perkins's arguments and additionally argues that the circuit court's ruling was correct because Perkins is a "public figure" and cannot prove "actual malice."[4] In his reply brief, Perkins argues that Littleton waived the "public figure" issue because he did not raise the issue in the circuit court.

---

[2] "Defamation is divided into two torts, including libel for written defamations and slander for oral ones." *Funderburk v. Johnson*, 935 So. 2d 1084, 1101 (¶45) (Miss. Ct. App. 2006). According to the *Restatement (Second) of Torts*, "Broadcasting of defamatory matter by means of radio or television is libel, whether or not it is read from a manuscript." *Restatement (Second) of Torts* § 568A (1977). It does not appear that this issue has been decided under Mississippi law, and we need not decide it in this case.

[3] The *Greenwood Commonwealth* filed a motion to quash the subpoena in the circuit court. However, Perkins's notice of appeal failed to designate the newspaper as a party "against whom the appeal [was] taken." M.R.A.P. 3(c). Moreover, there is no indication that Perkins served the newspaper with a copy of his notice of appeal, and the newspaper did not file a brief on appeal. Therefore, we doubt that the issue of the subpoena is properly before us on appeal. *See, e.g.*, *Estate of Perry ex rel. Rayburn v. Mariner Health Care Inc.*, 927 So. 2d 762, 765 (¶8) (Miss. Ct. App. 2006) ("Pursuant to Rule 3(c), our review is limited to those parties named in an appellant's notice of appeal."). In any event, the issue is moot based on our determination that Littleton's statement was not defamatory.

[4] *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (holding that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not").

¶15. As we explain below, we conclude that the statement was clearly directed at Perkins, and there are factual disputes as to whether the statement was false and whether Littleton knew it was false. However, we affirm because we conclude, as a matter of law, that the statement was not defamatory. *See Stroud v. Progressive Gulf Ins.*, 239 So. 3d 516, 526 (¶31) (Miss. Ct. App. 2017) ("This Court may affirm a circuit court if the correct result is reached, even if the circuit court reached the correct result for the wrong reasons." (brackets and internal quotation mark omitted)). Therefore, we need not address the various additional issues raised by the parties on appeal. *See Fulton v. Miss. Publishers Corp.*, 498 So. 2d 1215, 1216 (Miss. 1986) ("The threshold question is whether the statement made was defamatory, for if the statement was not defamatory, little else matters." (citation omitted)).

## I. Littleton's statement was clearly directed toward Perkins.

¶16. The Mississippi Supreme Court has stated that "[t]wo restrictions upon the action for defamation are and must be strictly enforced." *Ferguson v. Watkins*, 448 So. 2d 271, 275 (Miss. 1984). "First, the words employed must have clearly been directed toward the plaintiff." *Id.* Second, "the defamation must be clear and unmistakable from the words themselves and not be the product of innuendo, speculation or conjecture." *Id.*

¶17. The circuit court granted summary judgment based on the first of these two restrictions, finding that Littleton's statement was "not clearly and unmistakably directed toward [Perkins]." The circuit court emphasized that Littleton did not "specifically name [Perkins] or his daughter." However, we agree with Perkins that the statement was clearly directed at him and that the circuit court erred by finding otherwise.

7

¶18.    To begin with, the circuit court's description of Littleton's statement is accurate only in a narrow and technical sense.  Although Littleton did not name Perkins or his daughter within the specific statement that Perkins considers defamatory, he did name Perkins's daughter in the very next sentence of the same radio ad.  Moreover, Littleton named *only* Takiyah Perkins and not his other opponent in the election.  Arguably, this was sufficient by itself to clearly direct the statement at Willie Perkins.  *See Lawrence v. Evans*, 573 So. 2d 695, 698 (Miss. 1990) ("The said-to-be-offending words must be set in the context of the entire utterance.  Their complexion draws color from the whole.").

¶19.    However, we need not decide whether Littleton's reference to Perkins's daughter is sufficient, standing alone, to show that Littleton's statement was clearly directed at Perkins.  It is unnecessary to decide that issue because the summary judgment record shows that—as a matter of objective and undisputed fact—Littleton's statement *could not have been directed at anyone but Perkins*.  As discussed above, there is no dispute that White-Richard's father was deceased.  Thus, when Littleton said that "the father of one of [his] opponents" had "conspired" with his family, Perkins was the *only* person that Littleton could have been talking about.

¶20.    We agree with Perkins that a statement may be clearly directed toward the plaintiff even if it does not designate the plaintiff by name.  As the Mississippi Supreme Court has explained,

> Extrinsic facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody.  It is not necessary that everyone recognize the [plaintiff] as the person intended; it is enough that any recipient of the communication reasonably so understands it.

8

*Conroy v. Breland*, 185 Miss. 787, 796, 189 So. 814, 815 (1939) (quoting *Restatement (First) of Torts* § 564 cmt. b (1938)); *see also Montgomery Ward & Co. v. Skinner*, 200 Miss. 44, 58, 25 So. 2d 572, 575 (1946) ("[I]t was competent for the plaintiff to prove such additional facts and circumstances as would throw light on the question as to whether or not the third persons present would reasonably understand that the speaker intended to reflect upon her.").

¶21.    More recently, in *McCullough v. Cook*, 679 So. 2d 627 (Miss. 1996), the Supreme Court considered a defamation claim based on a sheriff's statement to a reporter that a truck with a particular license tag number had been confiscated in a drug bust. *See id.* at 630-31. The Court held that the sheriff's statement was actionable because a jury could find that the sheriff knew that (1) tag records would show the plaintiff as the registered owner of the truck, and (2) the reporter likely would run a check on the tag number and publish the plaintiff's name as the owner of the vehicle, but (3) the plaintiff had actually sold the truck weeks before the drug bust. *See id.* at 631. Significantly, the Court held that the sheriff's statement was actionable even though he did not use the plaintiff's name. *See id.* at 629-30; *see also Mitchell v. Random House Inc.*, 703 F. Supp. 1250, 1256 (S.D. Miss. 1988) (recognizing that statements in a book were clearly directed at the plaintiff even though she was referred to only as the "sister" of another person and never identified by name), *aff'd*, 865 F.2d 664 (5th Cir. 1989).

¶22.    As a federal district court in Mississippi has stated, "It is generally recognized . . . that a plaintiff need not be mentioned by name so long as he is pointed to by description or other circumstance tending to identify him as an object of the defamatory language." *Gales v. CBS*

*Broad. Inc.*, 269 F. Supp. 2d 772, 780 (S.D. Miss. 2003) (internal quotation mark omitted), *aff'd*, 124 F. App'x 275 (5th Cir. 2005). In addition, the *Restatement (First) of Torts* and *Restatement (Second) of Torts* both state that "[i]t is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended." *Restatement (First) of Torts* § 564 cmt. b (1938); *Restatement (Second) of Torts* § 564 cmt. b (1977). Many other authorities support this rule.[5]

¶23. Applying this rule, it is clear that Littleton's statement was directed toward Perkins. As discussed above, based on Littleton's statement and the objective and undisputed facts, the statement could not have been directed at anyone but Perkins. Moreover, Perkins provided additional evidence in the form of three affidavits of residents of the community who heard the advertisement and immediately knew that Littleton was talking about Perkins. *See* 3 Dan B. Dobbs et al., *Law of Torts* § 528 (2d ed. 2011) ("One type of admissible

_____

[5] *See, e.g.*, 1 Rodney A. Smolla, *Law of Defamation* § 4:40 (2d ed. 1999) ("The plaintiff need not be cited by name for the defamation to be 'of and concerning' him." (collecting cases)); David Elder, *Defamation: A Lawyer's Guide* § 1:30 (2008) (stating that it is "well established" that the plaintiff need not "be specifically named" in the defamatory statement (collecting cases)); *Doe v. Hagar*, 765 F.3d 855, 862-63 (8th Cir. 2014) ("[T]he plaintiff need not be named if the alleged libel contains matters of description or other references therein, or the extraneous facts and circumstances show that plaintiff was intended to be the object of the alleged libel, and was so understood by others." (alteration omitted)); *Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 216 (D.C. Cir. 1999) ("[I]t suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named . . . ."); *Alvord-Polk Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1015 (3d Cir. 1994) ("The law does not require that a plaintiff be specifically named in an allegedly defamatory statement, for a statement might be defamatory if, by description or circumstances, it tends to identify the plaintiff as its object.").

extrinsic evidence is the declaration by a witness that he was a recipient of the publication and that he understood it as referring to the plaintiff."). This was more than sufficient to meet Perkins's burden of showing that the statement was directed at him. *See Conroy*, 185 Miss. at 796, 189 So. at 815.

¶24. Littleton also makes an alternative argument that the circuit court's ruling should be affirmed because *he himself* did not know that his statement was directed at Perkins. Littleton claims that all he knew was what his mother told him, which was "that she had met with the father of one of his opponents." However, Littleton's argument fails because he relies on facts that are in dispute. In an affidavit, Littleton's mother denied that she made the statement that Littleton attributes to her.[6] In addition, Perkins's affidavit states that Littleton was present when White-Richard stated that her father was deceased.

¶25. Moreover, Perkins's argument also fails because there is no "requirement that the defendant actually intend to refer to the plaintiff." Dobbs, *supra*, § 527. Rather, the issue is whether a hearer "would reasonably believe" that the statement refers to the plaintiff. *Id.*; *accord Restatement (Second) of Torts* § 564 cmt. b (1977) ("If the communication is reasonably understood by the person to whom it is made as intended to refer to the plaintiff, it is not decisive that the defamer did not intend to refer to him."); Elder, *supra*, § 1:30 ("The

---

[6] For the same reason, we also reject Littleton's argument that he is entitled to summary judgment because Perkins cannot "prove[] that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.*, 376 U.S. at 279-80. Littleton claims that he believed his statement to be true because he simply repeated what his mother told him. However, his mother's unequivocal denial creates a factual dispute and permits an inference that Littleton knew that the statement was false.

11

cases generally reject any suggestion that defendant's intent . . . is controlling." (collecting cases)). Put simply, a speaker cannot defame an identifiable person and then avoid liability by claiming that *he himself* did not know whom he was defaming.

## II. Though clearly directed toward Perkins, Littleton's statement was not defamatory.

¶26. "In the procedural life of a defamation suit, the court determines whether the statement bears the meaning ascribed to it by the plaintiff and whether this meaning is defamatory." *Fulton*, 498 So. 2d at 1216. "If the court decides against the plaintiff on either of these questions, the case is ended." *Id.* "Subject to our normal standards, the question whether said-to-be-offending words are defamatory may be decided by the Court without submission to the trier of fact." *Lawrence*, 573 So. 2d at 697.

¶27. "There is a difference between making a false statement about another person and making a defamatory statement. The latter requires more than mere error." *Id.* "[Our Supreme] Court has described a defamatory statement as any written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community." *Journal Publ'g Co. v. McCullough*, 743 So. 2d 352, 360 (¶24) (Miss. 1999) (brackets and internal quotation marks omitted). "The said-to-be-offending words must be set in the context of the entire utterance. Their complexion draws color from the whole." *Lawrence*, 573 So. 2d at 698.

¶28. "[T]he defamation must be clear and unmistakable from the words themselves and not be the product of innuendo, speculation or conjecture." *Journal Publ'g Co.*, 743 So. 2d at

12

360 (¶24).  If the hearer "must struggle to see how and whether they defame, by definition the words are not defamatory in law.  Words which may be found defamatory only with the aid of a most vivid imagination are not actionable." *Lawrence*, 573 So. 2d at 698 (internal quotation marks omitted).

¶29.   The words at issue in this case consist of an accusation that Perkins met and "conspired" with Littleton's family "to go public with [a] family dispute to derail [Littleton's] campaign."  The "family dispute" centered around a lawsuit in chancery court in which Littleton's mother and sister alleged that Littleton had forged documents related to his father's estate.  The lawsuit had been pending—and, thus, the allegations against Littleton had been a matter of public record—for about a year when they were reported in the local newspaper during Littleton's campaign for circuit judge.  As Littleton's radio ad stated, the family dispute arose "well in advance of [Littleton's] decision to run for circuit judge."  Littleton stated that his mother's and sister's allegations against him were false, but Littleton has never stated or implied that Perkins was responsible for those allegations or that Perkins played any role in initiating the "family dispute."  To the contrary, in the context of the entire utterance, Littleton's only statement directed at Perkins was that Perkins had "conspired" to bring a pending lawsuit to the attention of the newspaper and the public.

¶30.   In context, Littleton's statement was not defamatory.  The essence of the allegedly defamatory words was that Perkins "conspired" to tell a newspaper reporter about a pending lawsuit—a matter of public record—in order to "derail" Littleton's campaign.  It is undoubtedly common for political candidates and their supporters to feed the press

13

information about their political opponents. They often do so in an effort to "derail" the opponent's campaign. This is part of what has become known as "opposition research." It is possible for such tactics to involve conduct that is unethical. However, it is not inherently defamatory to assert that a person sought to obtain a political advantage by telling a reporter about a matter of public record involving a candidate for public office. In substance, that is all that Littleton said about Perkins.

¶31. Perkins takes particular offense at Littleton's use of the term "conspiracy." Indeed, Perkins argues that we should interpret Littleton's statement as an accusation that Perkins was a member of a *criminal* conspiracy. However, this is hardly the "clear and unmistakable" import of "the words themselves." *Journal Publ'g Co.*, 743 So. 2d at 360 (¶24). A claim for defamation cannot be based on "innuendo, speculation or conjecture," *id.*, or a "vivid imagination," *Lawrence*, 573 So. 2d at 698. "[B]y definition," "words are not defamatory in law" if we "must struggle to see how and whether they defame." *Id.* On its face, Littleton's statement does not accuse Perkins of any criminal activity. Nor does the statement clearly or unmistakably imply that Perkins committed a crime. Accordingly, we cannot attribute that meaning to it.

¶32. Moreover, the First Amendment protects "imaginative expression" or "rhetorical hyperbole" when such statements "cannot reasonably be interpreted as stating actual facts about an individual." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (brackets and internal quotation mark omitted). For example, in *Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6 (1970), the Supreme Court held, as a matter of

14

constitutional law, that statements characterizing a developer's negotiating tactics as "blackmail" could not support a claim for defamation. The Court reasoned that, in context, no one could have interpreted the statements as "charging [the developer] with the commission of a criminal offense." *Id.* at 14. "On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable." *Id.*

¶33.   Similarly, in *Old Dominion Branch No. 496, National Association of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264 (1974), the Court held that a union newsletter's characterization of non-union workers as "traitors" could not support a claim for libel. *See id.* at 283-86. Following the reasoning of *Bresler*, the Court held that it was "impossible to believe that any reader . . . would have understood the newsletter to be charging the ['traitors'] with committing the criminal offense of treason." *Id.* at 285. Rather, the term was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members towards those who refuse to join." *Id.* at 286;[7] *see also, e.g.*, *Ollman v. Evans*, 750 F.2d 970, 1005 (D.C. Cir. 1984) (Bork, J., concurring) ("[In *Bresler* and *Austin*, the Supreme Court] assumed that even if these statements were made with actual malice, they were protected because the context in which they appeared alerted the reader that the

_____

[7] In *Austin*, because the Court held that the "publication . . . was protected under the federal labor laws," it was unnecessary for the Court to address the defendants' argument that their speech was also protected by the First Amendment. *Austin*, 418 U.S. at 283 n.15. However, the Court relied on and followed *Bresler*'s constitutional analysis. *See Austin*, 418 U.S. at 284-86.

statements were not to be read as factual allegations."); *Pullum v. Johnson*, 647 So. 2d 254, 258 (Fla. Dist. Ct. App. 1994) (holding that in the context of a speech criticizing the defendant for supporting an amendment to a local ordinance to allow the sale of liquor, the plaintiff's description of the defendant as a "drug pusher" was only "rhetorical hyperbole" and could not be understood as accusing the defendant of an actual crime).

¶34. Likewise in this case, no reasonable listener would have understood the radio ad's brief reference to Perkins as charging him with a crime. At most, the statement alleged that Perkins had, for political reasons, told a newspaper reporter about an ongoing lawsuit against Littleton. But even assuming that this statement was false, it was not defamatory.

¶35. Not every "false statement about another person" rises to the level of a "defamatory statement." *Lawrence*, 573 So. 2d at 697. "[M]any demonstrably unfair" "linguistic slings and arrows" are not actionable. *Ferguson*, 448 So. 2d at 276. Mississippi law does not "assess damages for all bruised feelings." *Id.* Littleton's brief reference to Perkins as the unnamed "father of one of my opponents" did not expose Perkins "to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community." *Journal Publ'g Co.*, 743 So. 2d at 360 (¶24). At worst, it was an untrue statement that, for political reasons, Perkins told a local reporter about a pending lawsuit involving a candidate for public office. As a matter of law, the statement was not defamatory. Accordingly, we affirm the final judgment of the circuit court granting summary judgment in favor of Littleton.

¶36. **AFFIRMED.**

16

**LEE, C.J., GRIFFIS, P.J., BARNES, FAIR, GREENLEE AND TINDELL, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., NOT PARTICIPATING.**